**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **MARILYN BARNES,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| vs. ) | |
| ) | **Case No. 09-CV-306-TCK-FHM** |
| **OCCIDENTAL PETROLEUM** ) | |
| **CORPORATION,** ) | |
| ) | |
| **Defendant.** ) | |

**OPINION AND ORDER**

Before the Court is Defendant's Motion for Summary Judgment (Doc. 26). For reasons set forth below, such motion is granted.

**I.    Factual Background[1]**

Plaintiff Marilyn Barnes was employed by Defendant Occidental Petroleum Corporation ("OPC") for over twenty years in various capacities. From approximately 2005 until September 2008, Plaintiff was employed in OPC's Tulsa service center as a relocation supervisor. Plaintiff's duties included overseeing temporary and permanent relocations of OPC employees. In her capacity as relocation supervisor, Plaintiff supervised two employees, Marilyn Sokolosky ("Sokolosky") and Kitty Gardner ("Gardner"). In mid-September 2008, Plaintiff received a complaint from an OPC employee about temporary housing arrangements in Houston. Specifically, after Hurricane Ike, the employee was having trouble with electricity, water, and other basic utilities in his temporary housing. On September 23, 2008, Plaintiff and Sokolosky attempted to call Jetola Blair ("Blair"), an OPC human resource specialist, regarding these issues. At the time of this call to Blair, Plaintiff was working from home, Sokolosky was working in the Tulsa office, and Blair was working in the

---

[1] The following facts are not disputed or construed in a light most favorable to Plaintiff.

Houston office. With Plaintiff already on the line, Sokolosky called Blair and reached her voice mail. After leaving a message to return the call, Sokolosky believed she disconnected the line to Blair but did not actually disconnect the line. Plaintiff and Sokolosky continued to have a conversation, which was recorded on Blair's voicemail.

The recorded conversation and a transcript thereof are part of the summary judgment record ("9/23/08 recording"). The content of the 9/23/08 recording is not in dispute and includes the following exchange:

> [Sokolosky:] He went into an apartment, I mean a hotel.
> [Plaintiff:] A hotel. And, you know, is his wife pregnant? Is there some reason – we didn't even know– I'm just going to tell her [Blair] we didn't even know anything about that crisis thing, and now that we know about the crisis, we were instructed – and I'll tell her, Leah instructed us to send everybody to crisis center, so – you know? And they will determine whether he had an issue, but we didn't know that they were telling him all that stuff, and now we're instructed we're not supposed to be giving them any favorable condition. I'll be glad to tell her and she can say – go back management, you know, what in the God's name does she [Blair] get paid for? I don't know, you know? I'm sure she gets paid a hell of a lot more than you and I.
>
> [Sokolosky:] Oh probably, I'm sure.
> [Plaintiff:] You know, and she [Blair] is worthless, I know and I shouldn't say this, but she's black, and, you know, [Gardner] thinks she's wonderful, but she's not worth shit and has always been that way. And Bill will be the other one to first tell you that she ain't worth crap, you know. So – well, if she calls back, go ahead and give me a call . . . .

(Ex. 5 to Def.'s Mot. for Summ. J.) In addition to the reference to Blair being "black" and "not worth shit," there are other derogatory statements regarding Blair's work. There are also several instances of profanity, including three instances where Plaintiff uses the word "fuck." After returning from a meeting, Blair retrieved the message and heard the conversation.

Blair immediately reported the voice recording to her supervisor, Darin Moss ("Moss"), and forwarded it to him. Moss reported the incident to Pat Dailey ("Dailey"), Director of Human

Houston office. With Plaintiff already on the line, Sokolosky called Blair and reached her voice mail. After leaving a message to return the call, Sokolosky believed she disconnected the line to Blair but did not actually disconnect the line. Plaintiff and Sokolosky continued to have a conversation, which was recorded on Blair's voicemail.

The recorded conversation and a transcript thereof are part of the summary judgment record ("9/23/08 recording"). The content of the 9/23/08 recording is not in dispute and includes the following exchange:

> [Sokolosky:] He went into an apartment, I mean a hotel.
> [Plaintiff:] A hotel. And, you know, is his wife pregnant? Is there some reason – we didn't even know– I'm just going to tell her [Blair] we didn't even know anything about that crisis thing, and now that we know about the crisis, we were instructed – and I'll tell her, Leah instructed us to send everybody to crisis center, so – you know? And they will determine whether he had an issue, but we didn't know that they were telling him all that stuff, and now we're instructed we're not supposed to be giving them any favorable condition. I'll be glad to tell her and she can say – go back management, you know, what in the God's name does she [Blair] get paid for? I don't know, you know? I'm sure she gets paid a hell of a lot more than you and I.
>
> [Sokolosky:] Oh probably, I'm sure.
> [Plaintiff:] You know, and she [Blair] is worthless, I know and I shouldn't say this, but she's black, and, you know, [Gardner] thinks she's wonderful, but she's not worth shit and has always been that way. And Bill will be the other one to first tell you that she ain't worth crap, you know. So – well, if she calls back, go ahead and give me a call . . . .

(Ex. 5 to Def.'s Mot. for Summ. J.) In addition to the reference to Blair being "black" and "not worth shit," there are other derogatory statements regarding Blair's work. There are also several instances of profanity, including three instances where Plaintiff uses the word "fuck." After returning from a meeting, Blair retrieved the message and heard the conversation.

Blair immediately reported the voice recording to her supervisor, Darin Moss ("Moss"), and forwarded it to him. Moss reported the incident to Pat Dailey ("Dailey"), Director of Human

Resources and Services Corporate Staff. Dailey directed his subordinate, Doug Rowley ("Rowley"), Human Resources Senior Manager, to investigate the incident. Rowley listened to the recording, spoke with Blair, and then interviewed Plaintiff and others. Following Plaintiff's interview, Rowley suspended her pending his investigation and told her she would likely be terminated. He also gave her the opportunity to resign or retire. After completing his investigation and discussing his findings with Dailey and OPC legal counsel, Rowley decided to terminate Plaintiff. Rowley made the termination decision on or around September 24, 2008. Rowley called Plaintiff at home that day and informed her that she was terminated. Thus, the termination decision was made approximately one day after the 9/23/08 recording and immediately following Rowley's investigation thereof.

At some point after learning she would be terminated, Plaintiff informed Rowley that she would like to retire. At a subsequent time, Plaintiff changed her mind and rescinded her retirement. Rowley's notes dated September 25, 2008 indicate that Plaintiff rescinded her retirement in an effort to receive unemployment benefits. At some point in time, OPC issued a written memorandum to other employees explaining that Plaintiff had "retired." In addition, Rowley instructed one of his subordinates to describe Plaintiff's status as "retired" on a form related to Plaintiff's request for unemployment benefits. According to Rowley, these references to Plaintiff's retirement were efforts to allow Plaintiff to "save face."

Rowley recalled one similar incident involving racial comments made by an employee named Scott Bland ("Bland"), which occurred on or around October 3, 2005. According to Rowley's affidavit in this case and a memorandum drafted by Rowley dated October 3, 2005, Bland made a comment to a group that certain African-American co-workers should go back to their hut in Africa. When confronted with the allegations, Bland denied making the comment and stated that

3

he was friends with his African-America co-workers. Based on these allegations, which Bland denied, Rowley terminated Bland. Bland was a thirty-two year old male.

At all times relevant to this lawsuit, OPC had in place an Equal Employment Policy ("Policy") and Code of Business Conduct ("Code"). The Policy, upon which Plaintiff received training, provides:

> The harassment of any employee based upon . . . color . . . or upon any racial, ethnic, or other personal characteristics is a violation of this policy. Racial harassment . . . will not be tolerated. *Any violator shall be subject to discipline, up to and including termination of employment.* Some examples of such conduct include . . . the creation of a hostile work environment; *and any other act that is offensive or interferes with another employee's performance*.

(Ex. 6, Def.'s Mot. for Summ. J., at 2-3 (emphasis added).) The Code provides: "Workplace Harassment. . . . Other conduct that is prohibited when unwelcome includes making or using derogatory comments, epithets, slurs . . . or comments regarding race . . . ." (Ex. 7, Def.'s Mot. for Summ. J., at 23.) Employees violating the Code are "subject to discipline, including dismissal." (*Id.*)

At the time of Plaintiff's termination, Plaintiff's husband, David Barnes ("DB"), was acutely ill with lung cancer that had spread to his liver and brain. DB died on November 30, 2008, five weeks following Plaintiff's termination. Plaintiff had several conversations regarding DB's illness with Bill Oswald ("Oswald"), Plaintiff's immediate supervisor. At the time of the 9/23/08 recording and the time of her termination, Plaintiff was either working from home or using accrued vacation in order to care for her husband. At the time of Plaintiff's termination, DB was receiving Medicare Part B benefits through OPC. According to Plaintiff's interrogatory answers, she contacted Rowley to determine if her termination date could be extended through her accrued vacation to give her additional time to secure Medicare Part B benefits for DB. According to Plaintiff, Rowley informed

her that a prior policy allowing this had changed and that termination dates could no longer be extended based on accrued vacation.

On May 21, 2009, Plaintiff filed this lawsuit asserting four causes of action: (1) age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* ("ADEA"); (2) associational discrimination in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* ("ADA"); (3) race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"); and (4) wrongful discharge in violation of Oklahoma public policy, which is known as a *Burk* tort, *see Burk v. K-Mart*, 770 P.2d 24 (Okla. 1989).

## II.     Summary Judgment Standard

Summary judgment is proper only if "there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of showing that no genuine issue of material fact exists. *See Zamora v. Elite Logistics, Inc.*, 449 F.3d 1106, 1112 (10th Cir. 2006). The Court resolves all factual disputes and draws all reasonable inferences in favor of the non-moving party. *Id*. However, the party seeking to overcome a motion for summary judgment may not "rest on mere allegations" in its complaint but must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The party seeking to overcome a motion for summary judgment must also make a showing sufficient to establish the existence of those elements essential to that party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-33 (1986).

**III.    ADEA Claim**

Under the ADEA, it is "unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). The Supreme Court recently concluded that "the ordinary meaning of the ADEA's requirement that an employer took adverse action 'because of' age is that age was the 'reason' that the employer decided to act." *Gross v. FBL Fin. Servs., Inc.*, --- U.S. ----, 129 S. Ct. 2343, 2350 (2009). The Court held that in order to "establish a disparate-treatment claim under the plain language of the ADEA[,] a plaintiff must prove that age was the 'but-for' cause of the employer's adverse decision." *Id.* Therefore, in all ADEA disparate treatment claims, the plaintiff must prove by a preponderance of the evidence that age was the "but-for" cause of the challenged employment decision. *Id.* at 2351 & n.4.

After *Gross*, courts struggled with whether the burden-shifting framework of *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973), continued to apply to ADEA cases. The Tenth Circuit recently clarified this issue, however, and held that a plaintiff may meet his burden under the ADEA by either direct evidence or by indirect evidence through the *McDonnell Douglas* framework. *Jones v. Okla. City Pub. Schs.*, 617 F.3d 1273, 1278 (10th Cir. 2010). Under this framework, Plaintiff must first make a prima facie case of discrimination under the ADEA, demonstrating that: (1) she is a member of a class protected by the ADEA; (2) she suffered an adverse employment action; (3) she was qualified for the position at issue; and (4) she was treated less favorably than others not in the protected class. *See Jones*, 617 F.3d at 1279 (citing *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 531(10th Cir. 1998)). "Once the plaintiff has made out a prima facie case, the employer must articulate a legitimate, nondiscriminatory reason for the adverse employment action."

*Pinkerton v. Colo. Dep't of Transp.*, 563 F.3d 1052, 1064 (10th Cir. 2009). If the employer does so, the plaintiff must show that the alleged reasons for the adverse action are pretextual. *Id.* Plaintiff can show pretext by pointing to "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (quotations omitted).

It appears that *Gross* has somewhat altered the analysis of the *McDonnell Douglas* framework in the ADEA context, however, with its holding that a plaintiff must prove that age was the "but-for" cause of the employer's adverse decision. The Tenth Circuit has recently explained that, even at the summary judgment stage, "it is not the employer's burden to negate any possible contributory role played by age in the challenged adverse action but, conversely, the employee's burden to show that age was the 'but for' cause of the action." *Medlock v. United Parcel Serv., Inc.*, 608 F.3d 1185, 1193 (10th Cir. 2010) (citing *Gross*, 129 S. Ct. at 2351). Judge Philip A. Brimmer of the District of Colorado provided a helpful explanation of *Medlock* and *Gross*, which this Court finds instructive:

> [I]n the wake of *Gross*, the Tenth Circuit appears to be endorsing closer district court consideration of whether, in addition to meeting the *McDonnell Douglas* three-part test, the plaintiff can show that age was a but-for cause of the challenged decision. *See Medlock*, 608 F.3d at 1193. It is not clear how exactly this consideration is to make its way into the analysis. *Medlock* suggests that it could come in at *McDonnell Douglas'* pretext stage. *Medlock*, 608 F.3d at 1194. In the alternative, *Medlock* seems to be stating that the lack of but for causation could undermine the reasonable inference of age discrimination that might otherwise arise due to *McDonnell Douglas*. *See Medlock*, 608 F.3d at 1194. Under this approach, the but-for consideration could be an overarching or subsequent consideration.

*Bradley v. Denver Health and Hosp. Auth.*, --- F. Supp. 2d ----, 2010 WL 3341508, at *22 (D. Colo. Aug. 24, 2010). The "but-for" causation standard thus appears to be a relevant consideration at the

summary judgment stage. *See id.*; *Wilbanks v. Nordam Grp., Inc.*, No. 09-CV-0572-CVE-TLW, 2010 WL 4272581, at *10 (N.D. Okla. Oct. 25, 2010) (granting summary judgment in favor of defendant on plaintiff's ADEA claim because, *inter alia*, plaintiff "ha[d] not made a showing that she would not have been terminated but for her age, and ha[d] therefore not met her burden to show pretext") (applying *Gross*'s "but-for" standard).

### A.   Prima Facie Case[2]

In this case, OPC is entitled to summary judgment because Plaintiff cannot establish the fourth element of her prima facie case – namely, that she was treated less favorably than others not in the protected class. Plaintiff has not presented any evidence regarding the identity or age of her replacement, which is the most common method of satisfying the fourth element. *See Adamson v. Multi Comm. Diversified Schs.*, 514 F.3d 1136, 1146 (10th Cir. 2008) (explaining that ADEA prima facie case ordinarily requires plaintiff to show that she was replaced by a younger person). Plaintiff's only evidence potentially related to the fourth element is her deposition testimony regarding one incident she witnessed while employed in OPC's Bakersfield, California office, which occurred sometime between 1996-1999 ("Bakersfield incident"). Plaintiff testified that an individual named Brian "shouted out things that weren't, you know, – in front of a group that weren't properly respectful." (Barnes Dep., Ex. 1 to Pl.'s Resp. to Def.'s Mot. for Summ. J., at 50.) However, Plaintiff has presented no evidence regarding this individual's age or the disciplinary decision taken as a result of his conduct. Because Plaintiff does not know Brian's age or what action

---

[2] In her response brief, Plaintiff made no arguments regarding the elements of her prima facie cases to prove age, association, or race discrimination but instead merely argued the she was able to show pretext. Nonetheless, the Court must determine as an initial matter whether Plaintiff can demonstrate a prima facie case for each claim and has endeavored to do so without the benefit of any specific arguments from Plaintiff.

OPC took following his alleged workplace outburst, this incident is insufficient to show that Plaintiff was somehow treated less favorably than younger employees who made inappropriate workplace comments.

Further, OPC has presented undisputed evidence that, approximately three years prior to Plaintiff's termination, Rowley terminated a younger employee, Bland, based on allegations that Bland made one racially inappropriate comment in a group of individuals. Although Plaintiff attempts to distinguish her comments from Bland's because she did not intend Blair to hear them, the Court does not view this as a meaningful distinction for purposes of Plaintiff's prima facie case. The undisputed evidence indicates that Rowley took a "no tolerance" approach to racial comments in the workplace, regardless of an individual's age, and that Plaintiff was not treated differently than younger employees who committed similar infractions.

### B.     Legitimate Reason for Termination

Assuming Plaintiff could make a prime facie case, the burden shifts to OPC to articulate a legitimate, non-discriminatory for Plaintiff's termination. OPC has satisfied this "exceedingly light burden," *see Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1173 (10th Cir. 2007), by offering Rowley's testimony that he terminated Plaintiff based on: (1) violation of the Policy and the Code, and (2) the unacceptable nature of her conduct. As to why Rowley deemed Plaintiff's statement during the 9/23/08 recording to be unacceptable conduct, he explained that, in his view, the voice recording reflected "unprofessional conduct, very poor management skill[s], [and was] socially offensive." (Rowley Dep., Ex. 3 to Def.'s Mot. for Summ. J., at 25.)  Rowley further explained:

> Well, I don't mean for this to include everything, but her use of the F-bomb with a subordinate; the way that she talked about her employees or our employees; the fact that she was doing that with a subordinate; the fact – and I believe that it is a quote, that she referred to [Blair] as not worth a shit to her subordinate. And the fact that she said . . . she's worthless and I shouldn't say this but she's black.

9

(*Id.* at 25-26.)

      **C.    Pretext**

Plaintiff has not presented any evidence that would tend to show weaknesses or implausibilities in OPC's proferred reasons for the termination. Plaintiff first argues that, because her comments were not directed to Blair, she did not actually violate the Policy or the Code, evidencing that such explanation is a pretext for illegal motivations. Plaintiff's argument is misplaced. The proper inquiry is not whether an actual policy violation occurred but is instead whether the employer genuinely believed a violation occurred. *See Pastran v. K-Mart Corp.*, 210 F.3d 1201, 1206 (10th Cir.2000) ("[T]he pertinent question in determining pretext is not whether the employer was right to think the employee engaged in misconduct, but whether that belief was genuine . . . ."). According to his affidavit, Rowley genuinely believed Plaintiff violated the Policy and the Code. Such belief is entirely plausible based on Blair's listening to Plaintiff's blatant, racially derogatory comments about her. Indeed, the Policy prohibits any act that is offensive or interferes with another employee's performance, indicating that a specific intent to harass is not necessarily required under the Policy. Regardless of whether a technical violation of the Policy or Code occurred, Plaintiff's conduct was not so innocuous that a reasonable juror could conclude that OPC's citation to the Policy as a reason for termination was somehow weak or implausible. Further, even assuming Rowley did not form a genuine belief that Plaintiff violated the Policy and the Code, Plaintiff has not shown any weakness or implausibility in Rowley's other proferred reason for the termination – namely, that making a racially derogatory comment and using excessive profanity on a work-related call with a subordinate is "unacceptable conduct."

Plaintiff also argues, as evidence of pretext, that the chosen remedy of termination was unduly harsh. However, Rowley's decision was based on his investigation, was made immediately

following his investigation, was expressly authorized by the Policy and the Code, and was consistent with his prior treatment of a similar situation occurring three years earlier. Under these circumstances, the selected remedy of termination was not out of the ordinary and does not demonstrate pretext.

Plaintiff further contends that OPC's "retirement" announcement somehow evidences pretext. The undisputed record shows that OPC allowed Plaintiff to retire immediately before she was terminated, that she did so, and that she then changed her mind. These facts do not tend to show weaknesses or implausibilities for the proferred reasons for termination. They simply show that OPC allowed Plaintiff some degree of control as to how Plaintiff's leaving OPC would be documented and/or presented to fellow employees. Plaintiff has failed to adequately explain how any discrepancies in labeling Plaintiff's departure demonstrate pretext under the circumstances presented.

Finally, whether the "but-for" causation requirement of *Gross* is considered an "overarching" or "subsequent" consideration to the pretext analysis, *see Bradley*, 2010 WL 3341508, at *22, it also prevents Plaintiff's ADEA claim from going to trial. None of Plaintiff's evidence "affirmatively supports an inference that age played any role in [the] decision" to terminate Plaintiff. *Medlock*, 608 F.3d at 1194. Specifically, no reasonable jury could conclude that age was a but-for cause of the termination, in light of Plaintiff's inappropriate statements, the ensuing investigation, and the immediate termination. Whether this employment decision was unfair or overly harsh is not relevant to the ADEA analysis. The question is whether age caused the termination, and no reasonable juror could conclude that it did. Thus, OPC is entitled to summary judgment on Plaintiff's ADEA claim.

**IV.     ADA Claim**

In order to establish a prima facie case of association discrimination under the ADA, Plaintiff must demonstrate: (1) she was qualified for the job at the time of the adverse employment action; (2) she was subjected to adverse employment action; (3) she was known by her employer at the time to have a relative with a disability; and (4) the adverse employment action occurred under circumstances raising a reasonable inference that the disability of the relative was a determining factor in the employer's decision. *Den Hartog v. Wasatch Acad.*, 129 F.3d 1076, 1085 (10th Cir. 1997). If Plaintiff can establish these four elements, then the burden shifts to OPC to proffer a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* Once such a reason is proffered, the burden shifts back to Plaintiff to show that OPC's stated reasons are pretextual. *Id.*

Plaintiff has not created a genuine question of fact as to the fourth element of her prima facie case. The circumstances surrounding Plaintiff's termination are simple – the recording was made by Plaintiff, heard by Blair, investigated by Rowley, and Plaintiff was immediately terminated. Plaintiff has not submitted any evidence whatsoever that Rowley, or any other OPC manager even tangentially involved in the termination decision, knew any details regarding the extent or stage of DB's illness or OPC's extension of benefits to DB. In her affidavit, Plaintiff states that Oswald had extensive knowledge of DB's illness; however, Oswald was not involved in the termination decision in any way. Further, Plaintiff testified that Oswald was always very accommodating to Plaintiff regarding DB's illness. In this case, there are no comments, prior events, or any other circumstances that raise a reasonable inference that DB's illness and/or OPC's provision of benefits to DB played a role in Plaintiff's termination decision.

In addition, for the same reasons explained *supra* Part III.C in relation to Plaintiff's ADEA claim, Plaintiff cannot demonstrate that OPC's proffered non-discriminatory reasons for her

12

termination are pretextual.[3] Therefore, OPC is entitled to summary judgment on Plaintiff's association discrimination claim under the ADA.

## V. Title VII Claim

Plaintiff is Caucasian and is not a member of a minority race; thus, her claim is one for reverse race discrimination, *i.e.*, that OPC treated her less favorably than non-white employees in making its termination decision. In order to make a prima facie case of reverse race discrimination, Plaintiff must demonstrate: (1) background circumstances that support an inference that OPC is one of those unusual employers who discriminates against the majority; (2) adverse employment action; and (3) disparate treatment among similarly situated employees. *See Mattioda v. White*, 323 F.3d 1288, 1292-93 (10th Cir. 2003) (explaining modification of first element of prima facie case in reverse race discrimination cases); *Notari v. Denver Water Dep't*, 971 F.2d 585 (10th Cir. 1992) (same); *Carney v. City and Cty. of Denver*, 534 F.3d 1269, 1273 (10th Cir. 2008) (setting forth traditional elements of prima facie case of race discrimination). If Plaintiff can establish these elements, then the burden shifts to OPC to proffer a legitimate, nondiscriminatory reason for the adverse employment action. *See Mattioda,* 323 F.3d at 1291. Once such a reason is proffered, the burden shifts back to Plaintiff to show that OPC's stated reasons are merely a pretext for race discrimination. *Id.*

Plaintiff has not created a genuine question of fact as to the first or third elements of her prima facie case. Plaintiff has presented no evidence whatsoever that support an inference that OPC is an unusual employer that discriminates against the majority. As to the third element, Plaintiff's

---

[3] The last paragraph of the ADEA pretext analysis, which relates to *Gross* and the but-for standard, is not applicable to the ADA analysis. Therefore, the Court relies only upon the other portions of Part III.C. in finding that Plaintiff has failed to demonstrate pretext.

only potentially relevant evidence is the Bakersfield incident. However, as with Plaintiff's age discrimination claim, Plaintiff presented no evidence regarding Brian's race or what disciplinary action OPC took as a result of his conduct. Because Plaintiff does not know Brian's race or the employment decision made after his alleged workplace outburst, the Bakersfield incident is insufficient to show that Plaintiff was treated less favorably than non-white employees who made inappropriate workplace comments.

In addition, for the same reasons explained *supra* Part III.C in relation to Plaintiff's ADEA claim, Plaintiff cannot demonstrate that OPC's proffered non-discriminatory reasons for termination are pretextual.[4] Therefore, OPC is entitled to summary judgment on Plaintiff's Title VII claim.

## VI.   *Burk* Tort Claim

The elements of a *Burk* tort claim include: "(1) an actual or constructive discharge (2) of an at-will employee (3) in significant part for a reason that violates an Oklahoma public policy goal (4) that is found in Oklahoma's constitutional, statutory, or decisional law or in a federal constitutional provision that prescribes a norm of conduct for Oklahoma and (5) no statutory remedy exists that is adequate to protect the Oklahoma policy goal." *Kruchowski v. Weyerhauser Co.*, 202 P.3d 144, 151-52 (internal citations omitted).[5] The Oklahoma public policy at issue in this case is set forth in the Oklahoma Anti-Discrimination Act ("OADA"), Okla. Stat. tit. 25, §§ 1101-1901. In relevant part, the Act provides:

---

[4] The last paragraph of the ADEA pretext analysis, which relates to *Gross* and the but-for standard, is not applicable to the Title VII analysis. Therefore, the Court relies only upon the other portions of Part III.C in finding that Plaintiff has failed to demonstrate pretext.

[5] As does OPC in its briefing, the Court assumes that the fifth element is satisfied for all types of alleged discrimination in this case.

14

> It is a discriminatory practice for an employer:
> [ ] To fail or refuse to hire, to discharge, or otherwise to discriminate against an individual with respect to compensation or the terms, conditions, privileges or responsibilities of employment, because of race, color, religion, sex, national origin, age, or handicap unless such action is related to a bona fide occupational qualification reasonably necessary to the normal operation of the employer's business or enterprise; . . .

*Id.* § 1302.

With respect to Plaintiff's claims of race discrimination and association discrimination, the Court concludes that Plaintiff cannot show that her termination was "in significant part for a reason that violates" the OADA. The bases for such conclusion are the same as those set forth above in analyzing Plaintiff's ADA and Title VII claims, as the same basic analysis applies to Plaintiff's *Burk* claims based on race and association discrimination. *See Armstrong v. Vanguard Car Rental, USA, Inc.*, No. 09-1046, 2009 WL 2230797, at *3 (W.D. Okla. July 22, 2009) ("Because Plaintiff's Title VII . . . claim[] fails, her *Burk* claim[] must likewise fail for the same reasons.").

With respect to the ADEA claim, *Burk*'s "significant factor" test is less stringent than *Gross*'s "but for" test. *See Medlock*, 608 F.3d at 1194 n.7 ("The *Gross* but-for standard does not apply to *Burk* tort claims. Such claims are governed by a "significant factor" test, imposing on the plaintiff "a more lenient standard than the 'but for' test.") (internal citations omitted). Therefore, there could be some cases in which a defendant is entitled to summary judgment on an ADEA claim but not a related *Burk* claim. In this case, however, Plaintiff did not come anywhere close to clearing the "but for" hurdle. As explained above in relation to Plaintiff's ADEA claim, Plaintiff cannot establish a prima facie case and has not presented any facts demonstrating pretext. Plaintiff has therefore failed to create a "triable case" as to whether age was even a "significant factor" in OPC's termination decision. *See Medlock*, 608 F.2d at 1197-98 (acknowledging different standards but holding that "[w]hat we have already said [in reference to the ADEA claim] should adequately

explain why [the plaintiff] failed to create a triable case that age played any role, much less a significant role, in the decisions to terminate his employment"). Accordingly, OPC is entitled to summary judgment on Plaintiff's *Burk* claim.

## VII. Conclusion

For the reasons stated herein, Defendant's Motion for Summary Judgment (Doc. 26) is GRANTED. A separate Judgment will be entered.

**IT IS SO ORDERED this 28th day of December, 2010.**

_____
**TERENCE C. KERN
UNITED STATES DISTRICT JUDGE**